[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10900
_____

D.C. Docket No. 6:11-cv-00827-RBD-DAB

KELVIN LEON REED,

                                                        Petitioner - Appellee,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

                                                        Respondents - Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 24, 2014)

Before HULL, MARCUS, and HILL, Circuit Judges.

MARCUS, Circuit Judge:

Almost a decade ago, Kelvin Leon Reed was convicted of the vehicular homicide of two pedestrians and sentenced to 35 years' imprisonment. Following a postconviction evidentiary hearing, the Florida circuit court rejected Reed's claim that defense counsel had rendered ineffective assistance by failing to investigate and call a witness at trial. The state appellate court summarily affirmed. The federal district court, however, granted habeas relief on this claim. After thorough review, we are constrained to reverse because Reed has not shown that the state court's ruling was contrary to or an unreasonable application of Supreme Court law. See Strickland v. Washington, 466 U.S. 668 (1984). As we see it, the state court had a reasonable basis for concluding that Reed did not suffer prejudice from any claimed deficiency, and thus, we decline to issue the writ.

I.

A.

The essential facts are these. On July 13, 2004, a tragic hit-and-run occurred in Orlando, Florida. While walking home from work at about 2:55 a.m., Michael Harper and Troy Henshaw were struck by a speeding blue Pontiac Sunfire traveling between 77 and 108 miles per hour. As a result of the impact, both victims were hurled over 150 feet and died about half an hour later. Jessica Patterson contacted the police and implicated Reed as the vehicle's driver. Willie Richards, who claimed to be a passenger in the car at the time of the crash, later

2

confirmed Patterson's identification, telling law enforcement officers that Reed drove the Pontiac Sunfire and struck the victims early that morning. When the police arrested Reed at approximately 6:30 a.m., he had a blood alcohol concentration of .14 grams of alcohol per 100 milliliters of blood.

The State charged Reed with two counts of driving under the influence (DUI) manslaughter in violation of Fla. Stat. § 316.193; two counts of vehicular homicide arising out of a failure to render aid or give information in violation of Fla. Stat. §§ 782.071 and 316.062; two counts of leaving the scene of an accident which resulted in death in violation of Fla. Stat. §§ 316.062 and 316.027(1)(b); and two counts of driving with a suspended license and causing serious bodily injury or death in violation of Fla. Stat. § 322.34(6).

Reed proceeded to trial in February 2005, during which the State dismissed the leaving-the-scene-of-the-accident counts. Following lengthy deliberations, the jury acquitted Reed of the DUI manslaughter charges. But it remained deadlocked as to the vehicular homicide and driving-with-a-suspended-license counts, resulting in a partial mistrial.

About a month later, Reed was retried on the four remaining counts. The State contended that Reed killed the victims "by running them over at somewhere between 77 and 100 miles an hour." He "[n]ever broke, never tried to avoid the collision[,] . . . [d]idn't stop, [and] didn't try to see if there's anything he could

3

do." Conversely, the defense theory was that Reed was home the night of the collision and was framed. Defense counsel argued that the State's main witnesses -- Richards and Patterson -- lacked all credibility. Moreover, counsel observed, no direct physical evidence linked his client to the "murder weapon," the Pontiac Sunfire.

The same witnesses who testified at Reed's first trial took the stand at the second. First, the State called twenty-one-year-old Richards. He testified that around 2:45 a.m. on July 13, 2004, he drove to his cousin's house in a blue Pontiac Sunfire after getting out of work at an Orlando nightclub. A "crack fiend" had loaned him the car in exchange for forty dollars worth of dope. Richards ran into Reed, a neighborhood friend, on Washington Street. He agreed to allow Reed to use the Sunfire so long as Reed drove him home first. Relevant to this appeal, Richards testified that on the way to his house, they encountered Jarvis Coleman. Reed agreed to give Coleman a ride too. Reed drove recklessly to Coleman's house, ignoring his passengers' advice to slow down. After dropping off Coleman, Reed sped to Richards's home in Pine Hills, still recklessly swerving in and out of lanes.

By Richards's account, the Sunfire careened forward at 110 miles per hour as it approached an intersection on Rio Grande Avenue. Richards noticed one other car traveling in the same direction as the Sunfire, and two pedestrians crossing the

4

road. Reed swerved around the car and drove into the middle of a median in between two lanes of traffic, running over the pedestrians. Richards recalled hearing and feeling a "loud thump." Glass shattered as the left rear window broke. Reed then announced, "I got them, Flip."[1] Unfazed, Reed continued driving until he reached a Citgo gas station. There he purchased rubbing alcohol, wiped down the driver's side of the vehicle, and attempted to snatch the tag off the car.

"[W]ant[ing] nothing to do with what [had] just happened," Richards walked to the home of Candace Stewart, the mother of his child. Reed left the car at the gas station and followed Richards there. Along the way, Reed threatened Richards: "[I]f we ever got to go to Court I don't know anything and if I do . . . something [will] happen." Stewart and her roommate, Jessica Patterson, were at the apartment when the intoxicated pair arrived. Richards retreated to the master bedroom to see his child. Reed was nervous and sweating, and would not let Richards out of his sight. Patterson and Richards eventually agreed to drive Reed home. Reed first sought to go back to the Citgo gas station, proclaiming he "wanted to blow the car up." But Patterson refused to stop and drove onto Rio Grande Avenue, which was blocked off with police tape. Reed then informed them that two pedestrians were dead and instructed Patterson to take a different route. After dropping off Reed, Patterson decided to call the police. Richards testified that he had not told

---

[1] "Flip" was Richards's nickname.

5

Patterson about Reed's accident and cover-up. He speculated that Patterson must have gleaned information about what had happened by speaking with Reed earlier. Patterson met with law enforcement officers at the gas station and subsequently informed Richards that she told the police "everything." Richards then contacted the police too.

On cross-examination, Richards, a two-time convicted felon on probation, conceded that on the night of the hit-and-run, he had consumed two Long Island Iced Teas and some shots of Hennessey. Richards also acknowledged that whenever Stewart was short on rent, he covered it. Moreover, Richards admitted that he feared going to jail on the morning of the collision, and was willing to do whatever he could to avoid incarceration.

Patterson took the stand next. Confirming Richards's version of events, Patterson recounted how around 3:45 a.m. on July 13th, Reed and Richards arrived at her apartment. Patterson knew Richards through her roommate, but she had never met Reed before. Patterson offered that both men seemed nervous, excited, and restless. Richards walked straight into Patterson's bedroom to see his daughter. To Patterson's surprise, Reed followed him. Richards and Reed implored Patterson to take them home, and she finally relented. On the way out the door, Reed asked Patterson three times for rubbing alcohol without explaining why he needed it. She complied.

6

En route to his home, Reed asked Patterson to drive him to the Citgo gas station. When she stopped, a man walked towards Patterson's car. Reed took off his jacket and hat and declared, "I'm going to blow this mother fucker up." Patterson called Stewart, and Richards got on the telephone to assure Stewart they "were not out [t]here to fight"; the situation was "far beyond that." Before her passengers could exit the car, Patterson doubled back to Rio Grande Avenue. As they passed a part of the roadway that was blocked off by police tape, Reed muttered, "[M]an, they dead." Notably, according to Patterson, Reed also said, "[M]an, I am fucked up. I am fucked up. I done hit these people. I'm fucked."

After dropping off Reed, Patterson and Richards headed back to Patterson's apartment. In contrast to Richards's account, Patterson asserted that along the way Richards told her about what happened earlier that morning. Patterson then decided to call the police. Patterson admitted that when law enforcement officials first interviewed her at the gas station, she gave a false name and address. She also lied to the officers by telling them that she met Reed for the first time at the gas station. Patterson explained that she lied because she did not want the police, television reporters, Richards's family, or Reed's family coming to her home. Moreover, she did not want her neighbors to discover she had cooperated with the police. However, Patterson accurately relayed to the officers the substance of what Reed had told her while she drove him home. Patterson also gave the police a hat that

7

Reed had left in her car. She then directed the police to Reed's home and identified him as the person she had given a ride. Later that day, after discovering that she could get into trouble for lying to the police, Patterson contacted the investigators with the full story.

Corporal Patricia Payne of the Florida Highway Patrol, the primary investigator in the case, also testified. As Payne described the collision, the State entered into evidence a crash reconstruction diagram and numerous depictions of the crime scene. Payne explained that July 13th was a clear night, and the roadway where the hit-and-run occurred was well-lit. There was no evidence of skid marks on the scene, indicating that the vehicle did not brake. Moreover, Payne confirmed that the car parts at the scene belonged to the damaged Sunfire recovered near the gas station. Blood and human flesh found on the vehicle matched the victims' DNA samples. Shattered glass from the left rear windowpane lay in the car. No fingerprints were found on the driver's side of the vehicle, including the steering wheel.

Payne recounted interviewing a scared Patterson, who led her to Reed's home. When Payne entered Reed's bedroom at around 5:45 a.m., Reed, surprisingly, did not appear to be sleeping or startled. Patterson identified Reed as the person she had dropped off that morning, and indicated that he was still wearing the same pants. Payne discovered cigarette lighters and money in Reed's

8

pockets. Payne testified that when she asked Reed about the collision, he remained nonchalant. Reed simply said he had been at his "people's house" on Washington Street that night, but had returned home at 11:30 p.m.

Moreover, Payne testified that Richards gave a statement to her later that day. Richards described how Reed ran over the pedestrians and followed him to Patterson's apartment. He also told Payne that Reed picked up a third passenger, Coleman, on the night in question, and dropped him off before the accident occurred. Richards gave Payne Coleman's address. But Payne was never able to locate this potential witness.

The State then called Florida Highway Patrol Trooper Ann Mulligan, who also investigated the crash. Mulligan testified that she found a black hat on the passenger floorboard of Patterson's car on July 13th. Patterson indicated the hat belonged to Reed. Mulligan submitted the hat to the evidence custodian in a sealed bag. Shawn Johnson, a DNA expert in the Florida Department of Law Enforcement, tested the hat. He explained that the DNA profile was mixed, which showed that two individuals had worn the cap. While one donor's sample DNA was too small to make a comparison, the six areas of the primary contributor's DNA profile matched Reed's DNA. In fact, the "probability of some other person having those six out of [thirteen] locations matching Mr. Reed's profile" was "one

9

in 8.6 million Caucasians[,] one in 4.5 million African Americans[,] and one in 8.2 million southeastern Hispanics."

Only twenty-three-year-old Reed testified on his own behalf. He flatly denied having anything to do with the accident, explaining that he had been framed. By Reed's account, at about 8:00 p.m. on July 12th, he went to the home of his friends, Gary and Jerry Greel. Reed returned home around 11:15 p.m. He then watched a movie with his pregnant fiancé, Latisha Brown. Several police officers woke him up around 5:00 a.m. When Corporal Payne asked Reed about the accident, he informed her that he did not know what she was talking about. Finally, Reed described that though he had seen Richards around the neighborhood, the two men were not friends. And Reed had never met Patterson before the court proceedings. Nonetheless, Reed knew Patterson's boyfriend, who gave him a ride to play pick-up basketball on July 11th. Reed recalled wearing a hat that day.

Unpersuaded by Reed's alibi, the jury convicted him on all four counts. The trial court dismissed the convictions for driving with a suspended license, but sentenced Reed to two consecutive terms of 17.5 years' imprisonment, one for each vehicular homicide count.

B.

Reed took a direct appeal to the Florida appellate court, which summarily affirmed his convictions and sentences. Reed v. State, 927 So. 2d 954 (Fla. 5th DCA 2006) (per curiam). Reed then petitioned the Florida appellate court for a writ of habeas corpus, alleging ineffective assistance of appellate counsel. The state court denied his petition without discussion.

On October 24, 2007, Reed moved pro se for postconviction relief in state court pursuant to Florida Rule of Criminal Procedure 3.850. He raised four claims, including an allegation that trial counsel, Thomas Luka, rendered ineffective assistance by failing to locate, interview, or call Coleman as a trial witness. Reed claimed Coleman's testimony would have impeached Richards's testimony and secured his alibi. In support of this motion, Reed filed a sworn statement from Coleman dated March 14, 2007, in which Coleman declared:

> I[,] Jarvess Coleman[,] have no acknowledgement of what Willie Richards[] is talking about[.] I have not seen him or Kelvin Reed in about 4 or 5 year[s]. I feel that it's my duty to tell the truth being that a man[']s life is on the line.

The state court conducted an evidentiary hearing on this ineffectiveness claim, but rejected Reed's remaining claims.

Three witnesses -- Coleman, Luka, and Reed -- testified. Coleman, an eight-time convicted felon, acknowledged that he had known Reed and Richards from the neighborhood since before 2004. He had lived at the same address in Orlando, Florida for the past fifteen years. Coleman claimed that no one contacted him to

11

testify in Reed's case; however, had he been contacted, he would have taken the stand. Coleman denied meeting Reed or Richards on the night of the hit-and-run, and denied ever being in a vehicle with either of them. The State questioned Coleman extensively about his sworn statement. But Coleman, who conceded he had memory problems, was unable to recall when he first learned about his alleged involvement in the case or which of Reed's family members approached him about signing his statement. Coleman also asserted that he was unaware of any bias Richards might have against him.

Next, Luka, Reed's former trial counsel and an experienced criminal defense attorney, took the stand. Luka acknowledged that during both trials, Richards testified that Reed gave Coleman a ride shortly before the accident. Coleman had also been listed as a potential State witness, but was not called during either trial. Luka admitted that he never attempted to contact Coleman. He "decided tactically that it would not benefit Mr. Reed in any way if Mr. Coleman was called to testify" because the "Defense's strategy from the beginning was that Mr. Reed was never, in fact, in the vehicle at any given time." Luka "did not want to risk defeating that defense by . . . eliciting evidence or testimony from an individual" who could contradict Reed's version of the events that night. Luka also testified that he repeatedly asked his client about Coleman. And, Reed consistently maintained that he had never met Coleman and did not know what Coleman would say if called as

12

a witness. According to Luka, Reed never asked him to contact and subpoena Coleman, despite Luka's frequent requests for alibi witnesses.

Luka knew that he was not required to disclose evidence favorable to the State's case if he interviewed Coleman and then decided not to call him to testify. But, at the same time, Luka offered that he could not "suborn any perjury." Luka feared that if Coleman had admitted to him that he knew Reed or was with him on the night of the collision, Luka would face an "ethical quandary" as far as defense strategy, particularly if he called Reed to the witness stand. Finally, after his memory was refreshed with a law enforcement investigative report, Luka testified that it appeared that State investigators had unsuccessfully tried to locate Coleman before trial.

In sharp contrast, Reed testified at the hearing that he had known Coleman since before 2004, and that he had never denied this. In fact, Reed had asked Luka multiple times -- both before and after his first trial -- to contact Coleman. But Luka failed to do so. Reed admitted that he could not specifically recall what Luka said when he asked him to contact Coleman. Reed also conceded that he did not know what Coleman would have said had he been contacted. Reed did not attempt to locate Coleman himself before trial, but he asked his friends to find him. Reed's friends failed in this endeavor. When the State asked Reed to name these friends, Reed initially responded "different people," and later he named a "dude named

13

Duck." Finally, turning to Coleman's sworn statement, Reed explained that one of

his friends reached out to Coleman for the statement, and Reed's mother sent it to

her son.

Following the evidentiary hearing, the state court entered an order denying

Reed's motion for postconviction relief. First, the court found that while neither

Coleman nor Reed were credible, Luka's testimony was believable. Citing

Strickland v. Washington, 466 U.S. 668 (1984), the state court determined that

Luka "offered a reasonable explanation for his failure to interview and call Mr.

Coleman as a defense witness." What's more, Reed also failed to demonstrate that

Coleman was even available to testify at trial. Finally, Reed had not shown

prejudice because Coleman's testimony would not have changed the trial outcome.

The court explained that in addition to Richards's trial testimony, Patterson's

testimony implicated Reed. Moreover, even if Coleman's testimony were credible,

it "would not verify that [Reed] was not the driver of the vehicle on the day of the

incident."

Reed appealed this decision to Florida's Fifth District Court of Appeal,

which summarily affirmed the denial of his postconviction motion. Reed v. State,

49 So. 3d 1283 (Fla. 5th DCA 2010) (per curiam).

C.

14

On May 18, 2011, pursuant to 28 U.S.C. § 2254, Reed filed pro se the instant petition for a writ of habeas corpus in the United States District Court for the Middle District of Florida. Reed raised seven claims, again alleging, inter alia, that trial counsel rendered ineffective assistance by failing to locate, interview, and call Coleman as a trial witness. In his amended reply, Reed conceded that he was not entitled to relief on four of his claims, but continued to press his allegation regarding counsel's failure to secure Coleman for trial.

On January 16, 2013, the district court conditionally granted Reed's habeas petition as to this ineffectiveness claim. Reed v. Sec'y, Dep't of Corr., No. 6:11-CV-827-ORL-37, 2013 WL 1222746, at *10, *13 (M.D. Fla. Jan. 16, 2013). First, the court found that Luka's failure to investigate Coleman as a potential witness amounted to deficient performance under Strickland. Id. at *7. The court explained that "no reasonable lawyer could have failed to at least attempt to contact Coleman to ascertain what he knew." Id. Next, the district court concluded that there was a reasonable probability the result of Reed's trial would have been different absent counsel's deficient performance. Id. at *9. The court reasoned that "[r]eviewing Coleman's testimony at the evidentiary hearing in combination with the trial transcript . . . conclusively establishes that Luka's failure to pursue the potential witness prejudiced the defense." Id. The court further explained that the state postconviction court had improperly "evaluated the impact of Coleman's testimony

15

in a vacuum, without taking into full consideration Coleman's testimony juxtaposed with that of Patterson and Richards." Id. Thus, it concluded, the state court's application of Strickland was unreasonable. Id. at *10. The district court rejected Reed's remaining claims and refused to grant a certificate of appealability. Id. at *12-13.

The Secretary timely appealed the district court's grant of habeas relief to this Court. Reed filed his initial brief pro se; thereafter, however, we appointed counsel who filed a supplemental brief.

## II.

We review de novo a district court's grant of a petition for habeas corpus. McNair v. Campbell, 416 F.3d 1291, 1297 (11th Cir. 2005). We also review a district court's rulings on questions of law and mixed questions of law and fact de novo, while findings of fact are reviewed only for clear error. Id.

Reed filed his federal habeas petition after the 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. Thus, AEDPA governs the petition and scope of our review. Penry v. Johnson, 532 U.S. 782, 792 (2001). Under AEDPA, when the state court has adjudicated the petitioner's claim on the merits, a federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

16

United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

"Under § 2254(d)(1)'s 'contrary to' clause, we grant relief only 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" Jones v. GDCP Warden, 753 F.3d 1171, 1182 (11th Cir. 2014) (alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). "Under § 2254(d)(1)'s 'unreasonable application' clause, we grant relief only 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (alteration in original) (quoting Williams, 529 U.S. at 413). "[A] strong case for relief does not mean the state court's contrary conclusion was unreasonable." Harrington v. Richter, 131 S. Ct. 770, 786 (2011). "[A]n 'unreasonable application of' [Supreme Court] holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). Finally, we may overturn factual findings by the state habeas court only when a petitioner produces "clear and convincing evidence" that those findings are erroneous. 28 U.S.C. § 2254(e)(1).

17

"AEDPA thus imposes a highly deferential standard for evaluating state-court rulings." Renico v. Lett, 559 U.S. 766, 773 (2010) (citations and internal quotation marks omitted). To clear the § 2254(d) hurdle, a habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87. More precisely, Reed must establish that no fairminded jurist would have reached the Florida appellate court's conclusion. See id.; see also Hittson v. GDCP Warden, No. 12-16103, 2014 WL 3513033, at *15 n.25 (11th Cir. July 9, 2014) (explaining that "state appellate court[s'] [summary] affirmances warrant deference under AEDPA because 'the summary nature of a state court's decision does not lessen the deference that it is due'" (alteration in original) (quoting Gill v. Mecusker, 633 F.3d 1272, 1288 (11th Cir. 2011))); Newland v. Hall, 527 F.3d 1162, 1199 (11th Cir. 2008) (concluding that "the highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision"). Though the Florida appellate court did not give reasons for affirming the postconviction court's decision, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state

18

court to deny relief." Richter, 131 S. Ct. at 784 (emphasis added). "If this standard is difficult to meet, that is because it was meant to be." Id. at 786.

## III.

Reed argues that the state court unreasonably applied Strickland when it rejected his claim that trial counsel acted ineffectively by failing to "call Coleman as a witness without first performing any pretrial investigation of him." To have been entitled to relief from the state court on this Strickland claim, Reed had to establish both deficient performance and prejudice. Strickland, 466 U.S. at 687; see Richter, 131 S. Ct. at 787. Strickland's performance prong would be satisfied only if the petitioner "show[s] that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. The prejudice prong requires the petitioner to establish a "reasonable probability" that, but for counsel's errors, the outcome at trial would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

In this case, we need not address the performance prong because the Florida appellate court had ample reason for concluding that Reed had not established Strickland prejudice. See id. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we

19

expect will often be so, that course should be followed."); Bishop v. Warden, GDCP, 726 F.3d 1243, 1254 (11th Cir. 2013) ("[A] court need not address both [Strickland] prongs if the petitioner has made an insufficient showing on one of them."). The district court erred in discounting these grounds.

For starters, there is a reasonable basis in the state court record to find that Coleman was unavailable around the time of trial. As the state circuit court noted, Coleman testified at the evidentiary hearing that he had resided at the same residence for the past fifteen years: 1712 26th Street in Orlando, Florida. This address matched the address listed for Coleman on the State's witness list. Nevertheless, Corporal Payne testified that she was unable to locate Coleman at the address Richards gave her. Buttressing Payne's assertion, Luka testified that the trooper's investigative report indeed reflected that law enforcement officers had unsuccessfully tried to find Coleman before trial. Moreover, Reed asserted at the hearing that he sent his friends to look for Coleman, who lived two streets over from him, but none was able to locate the potential witness. Finally, Coleman himself testified that when he first heard his name was raised in the case, he did not want to get involved. He explained, "I was like they need to keep me out of it."

Because the record amply supports the determination that Coleman was unavailable, we are hard-pressed to find that the outcome of Reed's trial would have been different had Luka investigated Coleman. See Elledge v. Dugger, 823

20

F.2d 1439, 1446 (11th Cir. 1987) (per curiam) (holding that for a habeas petitioner "[t]o prove that he was prejudiced by counsel's failure to investigate and to produce a certain type of expert witness," he "must demonstrate a reasonable likelihood that an ordinarily competent attorney conducting a reasonable investigation would have found an expert similar to the one eventually produced"), mod. on other grounds and reh. en banc den., 833 F.2d 250 (11th Cir. 1987); Monfiston v. Sec'y, Dep't of Corr., 559 F. App'x 863, 868 (11th Cir. 2014) (concluding that for the petitioner to show that he was prejudiced by counsel's alleged deficiency to investigate the witness, he had to rebut by clear and convincing evidence the state postconviction court's finding that the witness was unavailable to testify at trial); Gideon v. Dep't of Corr., 295 F. App'x 988, 990 (11th Cir. 2008) (holding that the state court's determination that the petitioner "could not show prejudice because he did not allege that [the witness] was available to testify, was a reasonable application of federal law to the facts of the case"); see also Nelson v. State, 875 So. 2d 579, 583 (Fla. 2004) (concluding that a defendant must identify the testimony that would have been provided and allege that the witness was available to testify to establish prejudice under Strickland).

What's more, the state appellate court had a reasonable basis for doubting Coleman's testimony that he was not with Reed or Richards on the night in question. Coleman, who had eight felony convictions, admitted he had memory

21

problems. He testified that he could not remember precisely when he first learned his name was raised in Reed's case. He estimated "[i]t was probably after the fact. A year or so probably." Later, however, he contradicted himself: "I heard about it . . . as the thing was going on, but I don't know exactly." Nonetheless, Coleman did not sign the affidavit attached to Reed's postconviction motion until three years after the crime had occurred. Coleman also admitted he "really [couldn't] remember" who approached him about signing the statement, but "believe[d] it was somebody in [Reed's] family." Nor could Coleman recall the gender of this family member or the "circumstance[s] of the person coming to [him]." At the request of Reed's family member, Coleman went to a notary public to sign the affidavit. However, he could not remember specifically where he went. Finally, Coleman said that Richards had no bias against him that he was aware of, and therefore, no discernable reason to lie about Coleman's involvement.

On this record, the state court had reasonable grounds for concluding that Coleman was an incredible witness, and thus, that counsel's failure to investigate Coleman and pursue him as a witness would not have prejudiced Reed. See Sullivan v. DeLoach, 459 F.3d 1097, 1109-10 (11th Cir. 2006) (holding that petitioner failed to establish "a reasonable probability that, had his trial counsel interviewed Renee and called her as a witness at trial," the trial outcome would have been different because "Renee's testimony wholly lacked credibility");

22

Thompson v. Nagle, 118 F.3d 1442, 1453 (11th Cir. 1997) (concluding that trial counsel's failure to call character witnesses did not constitute ineffective assistance because the witnesses' testimony was unbelievable and thus could not have affected the trial outcome).

The state appellate court had still another wholly independent and reasonable basis for denying relief: Coleman's account, even if credited, would not have directly exculpated Reed. At trial, Richards testified that Reed picked up and dropped Coleman off before the collision occurred. Coleman, however, denied ever being in a vehicle with Richards or Reed. At best, Coleman's potential testimony would only have impeached Richards's testimony. Coleman's testimony would not have removed Reed from the car on the fateful night of the collision. Nor would it have demonstrated that Reed was not the driver of the vehicle. This too could enable a fairminded jurist to find that Coleman's testimony would have been insufficient to undermine confidence in the convictions.

Finally, however, even if Coleman had testified and undercut Richards's account, there was substantial remaining evidence implicating Reed. See Fortenberry v. Haley, 297 F.3d 1213, 1228 (11th Cir. 2002) (per curiam) (reiterating that "the absence of exculpatory witness testimony from a defense is more likely prejudicial when a conviction is based on little record evidence of guilt"). To begin with, Patterson provided damning testimony supporting the jury's

verdict. Patterson asserted that on the morning of the collision, Reed and Richards arrived at her apartment and requested that she take them home. Patterson described both men as nervous, excited, and restless. To Patterson's surprise, when Richards walked into Patterson's room to see his daughter, Reed suspiciously followed him. Moreover, Patterson testified that on the way out of her apartment, Reed asked her three times for rubbing alcohol without indicating why he needed it. Patterson then drove Reed home in her car. Along the way, Reed asked Patterson to drive him to the Citgo gas station -- right near where the investigators testified they recovered the Sunfire. Soon thereafter, Reed admitted that he struck the two victims that night and killed them. Moreover, evidence of the hat found in Patterson's car corroborated her account and belied Reed's alibi. Trooper Mulligan discovered a black hat on the passenger floorboard of Patterson's car on July 13th. Patterson informed Mulligan that this hat belonged to Reed. Johnson, a DNA expert, confirmed to a high degree of statistical certainty that the primary donor's DNA profile on the hat matched Reed's.

The jury could infer Reed's guilt from additional circumstantial evidence. Consistent with the rubbing alcohol evidence, Corporal Payne, the lead investigator in the case, testified that no fingerprints were found on the driver's side of the Pontiac Sunfire, including the steering wheel. Moreover, Payne recounted her interviews with Richards and Patterson in the wake of the accident.

24

Corroborating Patterson's testimony, Payne asserted that Patterson told her during an interview that Reed mumbled that he "messed up" and "killed those people" when she drove him home. Payne also testified that Patterson -- whom Reed claimed he had never met until the court proceedings -- led the investigators to Reed's home on July 13th. When law enforcement officers entered Reed's bedroom at around 5:45 a.m., he did not appear to be startled or asleep. Patterson identified the defendant and alleged that he was wearing the same pants he had on earlier that morning. Reed, remaining nonchalant, denied knowing anything about the collision. He claimed he had been at his "people's house" on Washington Street -- where Richards testified he had run into Reed -- but got home around 11:30 p.m. Reed provided no further details about his whereabouts. At 6:30 a.m., law enforcement officials drew a sample of Reed's blood, which showed that Reed had a blood alcohol concentration of .14 grams of alcohol per 100 milliliters of blood. On this ample body of evidence, a reasonable jurist could find that even if Coleman had been called to testify, there was no reasonable probability the result would have been different.

Quite simply, the state appellate court ruling was neither contrary to nor an unreasonable application of clearly established Supreme Court law. Accordingly, we reverse the issuance of the writ and remand with instructions to reinstate Reed's convictions.

REVERSED.

HILL, Circuit Judge, dissenting:

I respectfully dissent for the reasons stated in the district court order of January 16, 2013.