[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13934

Non-Argument Calendar

_____

BRANDON JAMAL RYLES,

Petitioner-Appellant,

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF
CORRECTIONS,
WARDEN EASTERLING CF,
ATTORNEY GENERAL OF THE STATE OF ALABAMA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:18-cv-00569-ECM-SMD

_____

Before WILLIAM PRYOR, Chief Judge, JORDAN and NEWSOM, Circuit Judges.

PER CURIAM:

Brandon Ryles, a state prisoner, appeals *pro se* the denial of his petition for a writ of habeas corpus. 28 U.S.C. § 2254. Ryles argued that the State violated his right to due process by withholding a recording of a telephone conversation between Ryles, his codefendant, and his codefendant's girlfriend about exonerating him for the murders of Mark Adams and Carla Smilie. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972). Because the decision of the state court rejecting Ryles's argument is not contrary to or involves an unreasonable application of clearly established federal law, we affirm.

## I. BACKGROUND

We divide the background into two parts. First, we describe Ryles's trial and direct appeal. Second, we describe Ryles's federal habeas corpus proceeding.

### A. Ryles's Trial and Direct Appeal

On April 4, 2011, Adams and Smilie were shot and stabbed inside Adams's mobile home. The perpetrators also stole two

firearms and a BB gun from Adams's home. The investigation revealed that at least two different guns were used during the murders. Investigators identified John Foster as a suspect. Foster confessed and named others, including his cousin Marquisse McClaney and Ryles, as accomplices.

A grand jury in Alabama indicted Ryles, Foster, and McClaney for two counts of capital murder for killing during a robbery, ALA. CODE § 13A-5-40(a)(2), and one count of capital murder for killing two or more persons during one course of conduct, *id.* § 13A-5-40(a)(10). After his arrest, McClaney denied any knowledge of the crime. But after further interrogation, McClaney implicated Foster and Ryles.

McClaney told police that Ryles drove McClaney and Foster to Adams's home. Foster went inside to "holler at" Adams and then returned to Ryles's car to report that Adams and Smilie were "getting f***ed up." After Ryles urged Foster to rob the couple, Foster grabbed a shotgun from the back of Ryles's car and entered the home with Ryles. While McClaney served as lookout, he heard a gunshot, peered through the front door, and saw Ryles stabbing Smilie. McClaney blamed Ryles for "all the stabbing and cutting" and blamed Foster for shooting Adams and Smilie multiple times. McClaney also recalled seeing Ryles pull Adams's body from a chair and search his pants for a wallet.

Ryles blamed Foster for the murders. Ryles told police that he "was just the driver and that was it" and he was unaware of Foster's plan when the group arrived at Adams's home. Ryles stated

that Foster took Ryles's shotgun from the car and remarked, "I'm about to go up there . . . [and] get what's mine." Ryles and McClaney heard gunshots while waiting at the car and ran to Adams's front door. McClaney told Ryles that someone had been shot. Ryles denied entering Adams's home.

McClaney changed his story. McClaney wrote a letter in jail to "who ever that matter" blaming Foster for the two murders and denying that Ryles ever left the car. Later, McClaney repeated that version of events when deposed by Ryles's attorneys. But McClaney pleaded guilty to two counts of the lesser-included offense of felony murder, ALA. CODE § 13A-6-2(a)(3), and he agreed to serve as a state witness at Ryles's trial.

On August 31, 2014, while at Kilby Correctional Facility awaiting Ryles's trial the following week, McClaney telephoned his girlfriend, Vangela. Before the call connected, an automated voice advised the couple that they were sharing a "prepaid call" using an "account balance of $3.15" and that "this call is being recorded and subject to monitoring at any time." After discussing personal matters, Vangela said she knew Ryles's "lawyer went up there and talked to [McClaney] because they called [her]" and that he "ha[d] to take back what [he] said." Vangela said "the lawyers" told her "the only way they can help [McClaney] is if [he] back[ed] out of it." She repeated that "they going to try to get you out. They said as soon as they get Brandon [Ryles] out, they gonna get you out, but they can't help you if you don't take it back." Vangela expressed frustration with McClaney's mom, who "was telling them,

she was, like, well, they said Brandon [Ryles] did it." Vangela recounted telling McClaney's mother that she "talked to Brandon [Ryles]'s lawyer and . . . we going to try to get [McClaney] out of here. He got to keep his mouth shut." McClaney said that the district attorney had "tried to scare us and stuff," that his attorney and his mother had "bribed" him to accept a plea deal, and that he had "told [Ryles and his lawyer] the truth."

Vangela asked McClaney to "[h]old on" to "see if [she] could get Brandon [Ryles] on here for these last few minutes." After Ryles joined the call, he told McClaney, "Hey Buddy. You better do the right thing, but we coming to get you now." McClaney assured Ryles that he did not plan to testify against him. As the call ended, Ryles stated, "you're going to deal with them, you deal with me."

At trial, McClaney testified that Foster shot Adams and Smilie and described seeing Ryles stab Smilie. McClaney testified that Foster instructed him to "put it on [Ryles]." McClaney stated that he wrote the letter blaming Foster at Ryles's behest while the two were in the same jail and that he blamed Foster because Ryles threatened him and he feared Ryles. McClaney testified that, after being transferred to Kilby Correctional Center, he talked to Ryles over the telephone. McClaney stated that, during a phone call with Ryles after entering his plea, Ryles told him to "[d]o the right thing," which he took as a threat. McClaney stated that he lied to Ryles's attorneys during his deposition because he was "trying to look out for a friend," meaning Ryles.

After Ryles decided to testify, the prosecutor referred to Ryles "receiv[ing] a phone call as of a week before jury selection" from McClaney. Defense counsel remarked that he had not received a copy of the recording despite a standing order for open file discovery, and the prosecutor responded that he had obtained the recording only two days earlier from the Department of Corrections. The trial court ruled that the parties could not "get into those areas" unless defense counsel opened the door in some way and that Ryles taking the stand did not alone open that door. The trial court urged the parties to request a sidebar before introducing debatable evidence.

Ryles testified that he was unaware that Foster had armed himself before entering Adams's home. Ryles recalled that Foster returned to the car with firearms he received as collateral for money he was owed. Ryles denied entering Adams's home or hearing a gunshot and insisted that he learned of Adams's and Smilie's deaths two days later. Ryles maintained that the statement he gave after his arrest "was false." He admitted on cross-examination that he told McClaney to "do the right thing" while McClaney was at Kilby Correctional, but denied threatening to come after McClaney. The prosecutor did not attempt to introduce a recording of the telephone call or a transcript of the conversation, and defense counsel did not object to the line of questioning. Later, the prosecutor successfully sought a jury instruction on witness intimidation based on McClaney's testimony that Ryles had threatened him.

The jury found Ryles guilty of two counts of felony murder, as lesser-included offenses of his capital murder charges. The trial court sentenced Ryles to two consecutive terms of imprisonment for life.

Ryles moved for the State to produce the recording of the three-way telephone call. Ryles argued that the State had violated Alabama Rule of Evidence 613, which requires that, "[i]n examining a witness concerning a prior statement made by the witness, . . . on request the [statement] shall be shown or disclosed to opposing counsel," ALA. R. EVID. 613(a), and that the nondisclosure was prejudicial because the State suggested that he had intimidated McClaney and the trial court later gave a jury instruction on witness intimidation. The State responded that, because it learned of the recorded telephone conversation on the second day of trial, it asked McClaney and Ryles about conversations they had while incarcerated instead of introducing the recording into evidence. The State attested that it was providing Ryles the recording along with its response. The record does not reflect a ruling on Ryles's motion.

Ryles also moved for a new trial and argued that withholding the recording violated his right to due process. He argued that the recording contained statements suggesting that the district attorney had influenced McClaney to provide untruthful testimony. Ryles's motion for a new trial was denied by operation of law when the trial court failed to act before the deadline to rule on the motion expired. *See* ALA. R. CRIM. P. 24.4.

On direct appeal, the Alabama Court of Criminal Appeals ruled that the trial court did not abuse its discretion by denying Ryles's motion for a new trial. It mentioned that Ryles had participated in the recorded conversation, defense counsel could have independently discovered the recording had Ryles told counsel of the conversation, and defense counsel was informed of the recording during trial yet did not request a continuance to review and determine whether the recording was useful to Ryles's case. It declined to address whether the State suppressed the recording and ruled that Ryles suffered no due process violation because the statements McClaney made during the conversation were not material and were cumulative to evidence that he was untruthful because he changed his story repeatedly. It reasoned that "[f]urther corroboration of McClaney's lack of veracity would not have changed the outcome of Ryles's trial" because the jury must have discredited McClaney's version of events to find Ryles guilty of felony murder instead of capital murder. It also reasoned that the jury could have disregarded McClaney's testimony altogether and relied on other evidence, including Ryles's admissions to driving Foster to Adams's house, to convict Ryles of the lesser-included crimes.

Ryles moved the appellate court to rehear the case, and he petitioned the Alabama Supreme Court to issue a writ of certiorari. But both courts denied Ryles relief summarily.

### B. Federal Habeas Corpus Proceeding

Ryles, through counsel, petitioned for a federal writ of habeas corpus. 28 U.S.C. § 2254. He alleged that, in determining that

he could not establish materiality under *Brady*, the Court of Criminal Appeals incorrectly analyzed whether the outcome of his trial would have been different. He argued that the decision of the state court was contrary to *Wearry v. Cain*, 577 U.S. 385 (2016), and *Kyles v. Whitley*, 514 U.S. 419 (1995), because the state court incorrectly considered whether introducing the recording would have resulted in acquittal and whether sufficient evidence existed, absent McClaney's testimony, to convict Ryles. After the State responded, the magistrate judge issued a report and recommendation that the district court deny Ryles's petition because the state court's decision was not an unreasonable application of clearly established federal law.

The district court denied Ryles's petition. The district court sustained one of Ryles's objections to a single factual error in the report and recommendation and adopted the modified recommendation. The district court ruled that the state court cited the correct materiality standard for *Brady* error articulated in *United States v. Bagley*, 473 U.S. 667 (1985), and the fact that it omitted the precise "undermining confidence in the outcome" language from its decision did not mean that it applied the wrong standard. The district court rejected Ryles's argument that the recording was material and concluded that the state court's determination that the recording was merely cumulative to other testimony before the jury and evidence of his guilt was not an unreasonable application of the Supreme Court's materiality standard.

We granted Ryles a certificate of appealability to address his claim under *Brady*. *See* 28 U.S.C. § 2253(c).

## II. STANDARD OF REVIEW

We review *de novo* the grant or denial of a petition for a writ of habeas corpus. *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1260 (11th Cir. 2014). The Antiterrorism and Effective Death Penalty Act "imposes a highly deferential standard for evaluating state-court rulings." *Id.* at 1261 (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). A state prisoner is entitled to a writ of habeas corpus only if the state court reached a decision that "involved an unreasonable application of . . . clearly established Federal law." 28 U.S.C. § 2254(d)(1). That is, the state court must have "identifie[d] the correct governing legal principle from the Supreme Court's decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Reed*, 767 F.3d at 1260 (internal quotation marks omitted and alterations adopted). "[A]n unreasonable application of . . . [a Supreme Court decision] must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks omitted). The prisoner "must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

### III. DISCUSSION

Ryles maintains that the State violated his right to due process under *Brady* by withholding the recording containing McClaney's exculpatory statements. He argues that he was prejudiced because the trial court charged the jury on witness intimidation based on McClaney's testimony that Ryles threatened him, which was not supported by the withheld recording. We disagree.

As a preliminary matter, after the record on appeal was filed, but before briefing was complete, the State moved to correct the record. Fed. R. App. P. 10(e)(2)(C) (allowing appellate courts to certify and forward a supplement record if "anything material to either party is omitted from . . . the record by error or accident"). The State attached approximately 150 pages of McClaney's trial testimony that was not transmitted to the district court and explained that this omission likely was due to an uploading error. Because the State avers and our review confirms that the testimony in the supplemental exhibit was part of the record before the adjudicating state court, *see Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011), we supplement the record on appeal with this testimony.

To establish a *Brady* violation, Ryles had to establish that the evidence was favorable to him, either because it was exculpatory or impeaching, the prosecution willfully or inadvertently suppressed the evidence, and the suppression of the evidence prejudiced him. *Rimmer v. Sec'y, Fla. Dep't of Corr.*, 876 F.3d 1039, 1054 (11th Cir. 2017). To establish prejudice, Ryles had to prove that the suppressed evidence was material. *Id.* Evidence is material "only if

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would have* been different." *Bagley*, 473 U.S. at 682 (emphasis added). A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome," viewed in the light of the totality of the circumstances. *Id.* at 682-83. In other words, we must evaluate the withheld evidence "in the context of the entire record." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017). And a defendant need not prove that he more likely than not would have been acquitted had the suppressed evidence been admitted. *Wearry*, 577 U.S. at 392; *Kyles*, 514 U.S. at 434.

The district court did not err in denying Ryles relief on his *Brady* claim. Even assuming that it was exculpatory and suppressed, the recording was not material. *Bagley*, 473 U.S. at 682. McClaney's recorded statements to Vangela about having told Ryles's attorneys the "truth" was cumulative of other testimony that he would change his story to suit his audience, including Ryles. The jury first heard McClaney testify that he wrote the letter exonerating Ryles because Ryles threatened him and he was afraid of Ryles. The jury then heard McClaney admit to lying under oath to Ryles's attorneys at his deposition because he was "trying to look out for a friend." Defense counsel cross-examined McClaney extensively about his previous lies and motives, and McClaney maintained that he saw Ryles stab Smilie and denied lying to protect his plea. Viewed in the context of the full record, McClaney's recorded statements to Vangela, who was trying to convince McClaney to

retract his statement against Ryles to give both men a better chance avoiding punishment, and to Ryles, whom he admitted to being afraid of and threatened by, were cumulative of what the jury already knew about McClaney's credibility and would not have resulted in a different outcome. *Id.*

We also reject Ryles's argument that his case is nearly identical to *Wearry*, in which the Supreme Court reversed a death-sentenced prisoner's conviction based on *Brady* errors involving numerous pieces of undisclosed material information, including statements by the state's key witness that he wanted to make sure Wearry got "the needle." *Wearry*, 577 U.S. at 387-92. Unlike the evidence in *Wearry*, the recording here is cumulative of McClaney's testimony before the jury that his 25-year plea deal depended on testifying truthfully at trial. And he bluntly stated that if he did not testify, he would be put on trial and the State would seek to "put a needle in [his] arm." The jury, after hearing that testifying was McClaney's only way to avoid his own capital trial, acquitted Ryles of capital murder and instead convicted him of the lesser-included offenses. Viewed in the context of the entire trial record, the recording does not undermine our confidence in the outcome. *Turner*, 137 S. Ct. at 1893.

Insofar as Ryles raised it in his petition before the district court, the record also does not support a *Giglio* claim. *Giglio* error occurs "when 'the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.'" *Trepal v.*

*Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1107 (11th Cir. 2012) (quoting *Ventura v. Att'y Gen.*, 419 F.3d 1269, 1276-77 (11th Cir. 2005)). To establish a *Giglio* error, Ryles had to prove that the prosecutor knowingly used perjured testimony or failed to correct what he later learned was false testimony and that the use of the perjured testimony was material. *Id.* at 1107-08. The materiality standard for *Giglio* violations imposes a lighter burden on defendants to prove "any reasonable likelihood that the false testimony *could have affected* the jury's judgment." *Id.* at 1108 & n.22 (emphasis added). Because of this lower materiality standard, a *Giglio* error, unlike a *Brady* error, can be harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Trepal*, 684 F.3d at 1113.

Ryles failed to satisfy either requirement under *Giglio*. McClaney's recorded statements to Vangela that he had told the truth to Ryles's attorneys and to Ryles that he did not plan to testify against him do not prove that his trial testimony was false or perjured. At trial, McClaney admitted that he had lied several times for various reasons. The recording underscored what was clear from the start—McClaney would change his story to appease his audience. At trial, he testified under oath, subject to cross-examination, that he saw Ryles stab Smilie on the night of the murders, and the jury heard testimony that this account was consistent with the story McClaney gave police shortly after his arrest. More importantly, Ryles did not allege or present any evidence that the prosecutor knew or should have known that McClaney's

testimony was false. And even if he made these showings, he did not establish harm under *Brecht*. *Id.*

Ryles did not challenge the witness intimidation instruction on direct appeal, and the state court did not address it. 28 U.S.C. § 2254(b)(1)(A). But even if exhausted, his argument still fails because the instruction was supported by McClaney's testimony that Ryles threatened him into writing the to "who ever that matter" letter exonerating Ryles and blaming Foster.

## IV. CONCLUSION

We **GRANT** the State's motion to correct the record and **AFFIRM** the denial of Ryles's petition for a writ of habeas corpus.